# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

A Minor, BRB, by her Mother
and Next Friend, Renee M.
Bendlin,

      Plaintiff,

vs.

COMMISSIONER OF SOCIAL
SECURITY, Agent of Michael
J. Astrue,

      Defendant.

**No. 09-CV-4069-DEO**

**ORDER**

_____

## I.  INTRODUCTION AND BACKGROUND

Plaintiff, BRB, by her Mother, Renee Bendlin, seeks Supplemental Security Income (SSI) benefits under Title XVI of the Social Security Act (the Act), 42 U.S.C. § 1381 et seq. Tr. 48-51.  BRB seeks review of the Commissioner's decision that she is not disabled under the Act.  This Court has authority to review a final decision by the Commissioner pursuant to 42 U.S.C. § 405(g), as incorporated into Title XVI by 42 U.S.C. § 1383(c)(3).

BRB was born on August 24, 2001, and was seven years old and a "school-age child"[1] on the date on which the ALJ issued his decision. She is now nine years old. In her disability report, BRB is alleged to be disabled because of a complex multiple motor tic disorder. Tr. 61.

In 2005, BRB's mother, Ms. Bendlin, took BRB for an examination due to BRB's staring spells which lasted 4-5 seconds and occurred 20-30 times daily. Tr. 144. She underwent an electroencephalogram ("EEG"), the results of which suggested primary generalized epilepsy. Tr. 144, 147. Neurologist Dr. David diagnosed atypical absence seizures and prescribed anti-seizure medications. Tr. 146.

---

[1] See 20 C.F.R. § 416.926a(g)(2)(iv) ("School-age children (age 6 to attainment of age 12). When you are old enough to go to elementary and middle school, you should be able to learn to read, write, and do math, and discuss history and science. You will need to use these skills in academic situations to demonstrate what you have learned; e.g., by reading about various subjects and producing oral and written projects, solving mathematical problems, taking achievement tests, doing group work, and entering into class discussions. You will also need to use these skills in daily living situations at home and in the community (e.g., reading street signs, telling time, and making change). You should be able to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing your own ideas, and by understanding and responding to the opinions of others.").

Later, in February 2008, BRB was again evaluated for epileptic symptoms and underwent a 24-hour EEG. Tr. 136-39. The results of the 2008 EEG showed 37 clinical events (i.e. tics, movements, etc.), none of which showed abnormalities in the EEG. Thus, the report suggested that BRB's movements were nonepileptic in origin and may have been "more compatible with a complex motor tic than a seizure activity." Tr. 139.

In April 2008, BRB saw Dr. David again. BRB and her mother reported that the Clonidine that BRB took made her sleepy, so Dr. David reduced the dosage. BRB's mother reported that she captured BRB several days earlier pacing back and forth in her room with her arms extended. Ms. Bendlin videotaped the incident for Dr. David's review. Dr. David noted that, according to BRB's grandmother, BRB had a poor attitude and her grades were going down. Tr. 142. He diagnosed BRB with complex motor tic disorder and obsessive compulsiveness. Tr. 143.

From October 7, 2008 through October 22, 2008, BRB was examined in the Department of Child & Adolescent Neurology at Mayo Clinic in Rochester, Minnesota. Tr. 163-173. The physicians at Mayo Clinic diagnosed BRB with Tourette's

syndrome with motor and vocal tics and obsessive-compulsive features. Tr. 163.

Subsequent to her Mayo Clinic visit, BRB received psychiatric treatment at the Seasons Center. On December 17, 2008, BRB saw a psychiatrist, Dr. Segreto. Tr. 176-77. Dr. Segreto noted that, "periodically during the evaluation [BRB] would ask her mother things that had nothing to do with the evaluation." Tr. 175. She also noted,

> [BRB] has a great deal of difficulty sitting still during the appointment. She also has obvious motor and vocal tics, although I only heard a couple vocal tics and they were minor. She does have some facial tics. . . . She is lying on the couch and sitting on the couch, stomping her foot on the floor (reminiscent of ADHD). . . . The pacing that [BRB] does seems to be related to anxiety and she paces in a very methodical compulsive way.

Tr. 175. Regarding BRB's pacing, Dr. Segreto reported,

> She will pace for example from the chair to the window to the desk to the chair to the window to the desk, and she has to do it in that order and if she gets interrupted she has to start over, which is classic OCD behavior. She oftentimes tries to hide her pacing and will go to her room to pace, or leave the classroom to pace, which is another classic OCD behavior. If she gets really "worked up" in the classroom she will be removed from the classroom to go to the gym to pace. The teacher typically

4

> knows when [BRB] is reaching the point of
> needing to leave the classroom because she
> will complain of her head hurting or her
> stomach hurting.   However [BRB's] more
> likely to pace at home at night.

Tr. 176.  Dr. Segreto concluded that BRB's Global Assessment

of Functioning ("GAF") score was 40.[2]  Dr. Segreto prescribed

Focalin for BRB.[3]   She diagnosed BRB with ADHD, anxiety

disorder, and probable obsessive compulsive disorder.

Dr. Segreto saw BRB again on March 9, 2009.  She noted

that BRB had been doing better in school with the Focalin;

however, her mother reported that she was having troubles at

---

[2] A GAF score of 40 reflects "[s]ome impairment in
reality testing or communication (e.g., speech is at times
illogical, obscure, or irrelevant) OR major impairment in
several areas, such as work or school, family relations,
judgment, thinking, or mood (e.g., depressed man avoids
friends, neglects family, and is unable to work; child
frequently beats up younger children, is defiant at home, and
is failing at school)."   American Psychiatric Ass'n,
Diagnostic and Statistical Manual of Mental Disorders, at 34
(4th ed. 2000) ("DSM IV").

[3] "[Focalin] is used as part of a treatment program to
control symptoms of Attention Deficit Hyperactivity Disorder
(ADHD; more difficulty focusing, controlling actions, and
remaining still or quiet than other people who are the same
age) in adults and children. [Focalin] is in a class of
medications called central nervous system (CNS) stimulants. It
works by increasing the amounts of certain natural substances
in the brain."   Medline Plus Medical Encyclopedia,
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603014.html

home after school, once the Focalin had worn off.  Dr. Segreto
started BRB on a small dose of Focalin after school.  She
assessed BRB a GAF score of 50.[4]

At the ALJ hearing, BRB's mother testified as to the
effect of BRB's impairments on her everyday activities and
schoolwork.  Ms. Bendlin testified that BRB often "loses
track."  She stated that you could see in BRB's eyes "that
she's just not there, and she will walk back and forth, back
and forth."  Ms. Bendlin stated that "[t]here's been times
that [BRB] is like in a parking lot, will walk out in front of
a car if we don't have a hold of her . . . because she's not
aware of her surroundings."  Tr. 198.  When asked whether
BRB's symptoms and behaviors were the same at the time of the
ALJ hearing as they were when she went to the Mayo Clinic, Ms.
Bendlin testified that the symptoms were better controlled
with medication, but when the medication would begin to wear
off, BRB would get frustrated.  Tr. 199.  She also testified

_____

[4] A GAF score of 50 reflects "serious symptoms (e.g.,
suicidal ideation, severe obsessional rituals, frequent
shoplifting) OR any serious impairment in social,
occupational, or school functioning (e.g., few friends,
conflicts with peers or co-workers)."  DSM IV, at 34.

that BRB could not dress herself in the morning because she could not stay focused.  Tr. 209.

Regarding BRB's motor tic impairment, Ms. Bendlin testified that the tics were not under control and that she saw BRB tic "all of the time" on a daily basis.  Tr. 204.  Ms. Bendlin described the tic disorder symptoms as follows:  "Her mouth will drop open, her eyes will roll back . . . .  [S]he gets really tensed, and she'll like ring her hands together. . . .  Or lift her shirt up or there for awhile it was my shirt she was lifting up in public. . . .  And she grabs her breasts. . . ."  Tr. 213.

While at school, Ms. Bendlin testified that BRB's teacher permitted BRB to hold an object in class to assist with controlling her tics.  Tr. 204.  The school also permitted her to leave the classroom when she was about to have a burst of tics.

Ms. Bendlin testified that BRB's teachers permitted BRB to complete her schoolwork in separate parts.  She stated, "[t]hey can't give her a whole sheet of paper with questions on it.  They have to do it in parts because she gets overwhelmed and gets stressed out and frustrated."  Tr. 204.

Ms. Bendlin also testified that BRB had a teacher who worked with her one-on-one, and that the guidance counselor took BRB out of the room for a half hour every day.  Tr. 204-05.  She also testified that BRB's grading system was modified and that the teachers modified BRB's assignments as needed.  Ms. Bendlin testified that the modifications set out for BRB were a part of her Section 504 Accommodation Plan.[5]  Tr. 206.

Socially, BRB attended "King's Camp," which was a day camp sponsored by her church, and she played tee ball one year.  Tr. 208.  Her mother testified, however, that BRB did not socialize with other kids in or out of school.  When asked why, she stated, "[BRB's] just too picky.  She needs to have things her way.  She used to have a friend, but the friend doesn't come over anymore because they fight."  Tr. 210.

---

[5] BRB's Section 504 Accommodation Plain is summarized as follows:  (1) Sit at the back of the room (more room for tics to occur without peers seeing); (2) Modify assignments as needed:  Math and other long assignments have been modified; (3) Daily meeting with guidance counselor to discuss daily anxieties; (4) Water bottle during the day to prevent [urinary tract infections]; (5) Allowed to leave the room to walk off anxieties with a staff member who is free; and (6) Allowed to have various manipulatives at her desk for stress releasers.  Tr. 92.

## A.    Children's Disability Overview

> An individual under the age of 18 shall be
> considered disabled . . . if that
> individual has a medically determinable
> physical or mental impairment, which
> results in marked and severe functional
> limitations, and which can be expected to
> result in death or which has lasted or can
> be expected to last for a continuous period
> of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(C)(i).

There is a three step process for determining whether a child is eligible for SSI benefits.  20 C.F.R. § 416.924(a). The ALJ must determine at step one if the child is engaged in substantial gainful activity.  If not, step two requires the ALJ to determine whether the child's impairment or combination of impairments is severe.  If the ALJ determines that the child's impairment(s) is "severe," the analysis moves to step three.  At step three, the ALJ must determine whether the child's impairment(s) meets, medically equals, or functionally equals, the severity of a listed impairment.  If the child's impairment(s) does not meet or equal a listed impairment, the ALJ will assess all functional limitations caused by the impairment(s) to determine whether the functional limitations are disabling.  In order for an impairment or combination of

impairments to functionally equal a listing, the impairment or impairments must either result in a "marked" limitation in two domains of functioning, or an "extreme" limitation in one domain of functioning.[6] 20 C.F.R. § 416.926a(a).

A limitation is considered "marked" if the medical evidence shows that the impairment interferes seriously with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i). If the medical evidence shows the impairment interferes very seriously with the child's ability to independently initiate, sustain, or complete activities, it is considered "extreme." 20 C.F.R. § 416.926a(e)(3)(i).

The first domain of functioning is "acquiring and using information," which is how well the child acquires or learns information, and how well the child uses the information the child has learned. 20 C.F.R. § 416.926a(g). The next domain of functioning is "attending and completing tasks," which

---

[6] The domains of functioning are: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi).

considers the extent to which the child is able to focus, maintain attention, and initiate and complete activities. This domain also includes an assessment of the pace at which the child performs activities and the ease with which the child changes activities. 20 C.F.R. § 416.926a(h). The third domain of functioning is "interacting and relating with others," which includes an assessment of how well the child initiates and sustains emotional connections with others, develops and uses the language of the community, cooperates, complies with rules, responds to criticism, and respects and cares for others' possessions. 20 C.F.R. § 416.926a(i). The fourth domain of functioning is "moving about and manipulating objects," which includes the child's ability to move his body from one place to another. 20 C.F.R. § 416.926a(j). The fifth domain of functioning is "caring for yourself," which evaluates how well the child maintains a healthy emotional and physical state including appropriate meeting of his emotional and physical needs. 20 C.F.R. § 416.926a(k). The sixth and final domain of functioning is "health and physical well-being," which assesses the cumulative effects on the child of

his physical and mental impairments and the related treatment
or therapies. 20 C.F.R. § 416.926a(l).

**B. The ALJ's Decision**

In this case, the ALJ determined at step one that BRB did
not engage in substantial gainful activity at any time
relevant to the ALJ's decision. Tr. 13. At step two, the ALJ
determined that BRB had the following severe combination of
impairments: complex motor tic disorder, treated with
Clonidine; diagnosed obsessive-compulsive features or anxiety;
and diagnosed attention-deficit hyperactivity disorder,
treated with Focalin. Tr. 13.

At step three, the ALJ concluded that BRB did not have an
impairment or combination of impairments that met, medically
equaled, or functionally equaled the listed impairments in 20
C.F.R. § Part 404, Subpart P, Appendix 1. Tr. 13. In his
review of whether BRB's impairments functionally equaled the
listed impairments, the ALJ reviewed the effects of BRB's
impairments on the six domains of functioning.

In the first domain of functioning, "acquiring and using
information," the ALJ concluded that BRB had a less than
marked limitation. The ALJ reasoned that BRB's grades were

always generally good, averaging "A" and "B" in the second grade. The ALJ further noted that BRB was not on any individualized education plan ("IEP"), but that the accommodations she received at school were "modest and unobtrusive" and, given her motor tic disorder, only benefitted her in her ability to acquire and use information. Tr. 16.

In the second domain of functioning, "attending and completing tasks," the ALJ concluded that BRB had no limitation. The ALJ reasoned that any prior problem with focusing or completing work at school was "apparently solved by [BRB] being put on Focalin in December 2008 by Dr. Segreto." Tr. 17.

In the third domain of functioning, "interacting and relating with others," the ALJ concluded that BRB "evidences no more than a 'de minimus' limitation in interacting and relating with others and said degree of limitation is not shown to stem from a medically determinable medical impairment. For purposes of functional equivalence, this equates with no limitation in interacting an relating with others." Tr. 18. The ALJ reasoned that although BRB did not

socialize with friends, her second grade teacher stated she was a well-mannered and quiet girl. The ALJ further reasoned, "as [BRB] has been involved in various organized activities outside the school setting according to her mother . . . it appears she may just be shy. This is not shown to stem from a medically determinable impairment." Tr. 18.

In the fourth domain of functioning, "moving about and manipulating objects," the ALJ concluded BRB had no limitation. The ALJ reasoned that the record provided no reference to any such problems. To the contrary, the ALJ stated that BRB rode a bike and played tee ball. Additionally, the ALJ determined that BRB's motor tic disorder did not limit her ability to move about or manipulate objects. Tr. 19.

In the fifth domain of functioning, "caring for yourself," the ALJ concluded that BRB had no limitation. The ALJ reasoned that while BRB continued to have some problems in dressing herself in a timely manner, she had not experienced any problems in caring for herself while in school and in various doctor reports was reported to be well-groomed. Tr. 20.

In the sixth and final domain of functioning, "health and physical well-being," the ALJ concluded that BRB had no limitation. The ALJ reasoned that no medical professional had placed any restrictions on BRB and that her medications did not result in any side effects or limitations on BRB's functional performance, aside from the drowsiness caused by Clonidine. The drowsiness went away after the doctor decreased her dosage. Tr. 21.

Because the ALJ concluded that BRB did not have an impairment or combination of impairments that resulted in either "marked" limitations in two domains of functioning or "extreme" limitations in one domain of functioning, the ALJ concluded that BRB was not disabled under the Act. Tr. 21.

## II. LAW AND ANALYSIS

In reviewing this case, this Court is required to determine whether the ALJ's findings are supported by substantial evidence on the record as a whole. See 42 U.S.C. § 405(g); Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance of the evidence, but it is enough that a reasonable mind would find it adequate to support the ALJ's decision. See Johnson

v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). As long as there is substantial evidence in the record that supports the ALJ's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome or because the Court would have decided the case differently. See Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). If, after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. See Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000). Still, in reviewing the record this Court must remain mindful of the ALJ's "duty to develop the record fully and fairly" in the non-adversarial administrative proceeding. Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004); Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

In this case, the Court is persuaded the ALJ's decision that BRB was not disabled is not supported by substantial evidence on the record as a whole. Without discussing the ALJ's conclusion as to each domain of functioning, the Court concludes the ALJ's conclusions at the second ("attending and

16

completing tasks"), third ("interacting and relating with others"), and fifth ("caring for yourself") domains of functioning are not supported by substantial evidence.

In the "attending and completing tasks" domain of functioning, the ALJ concluded BRB had no limitation. The ALJ reasoned that any prior problem with focusing or completing work at school was "apparently solved by [BRB] being put on Focalin in December 2008 by Dr. Segreto." Tr. 17.

BRB had a history of behaviors that markedly affected her ability to attend to and complete tasks. In school, BRB required a number of accommodations for her impairments. Most notably, BRB's teachers modified assignments that were too long for her. BRB's mother testified that her daughter could not complete "a whole sheet of paper with questions on it" and that BRB had to answer questions "in parts because she gets overwhelmed and gets stressed out and frustrated." Tr. 204. BRB also, on occasion, left the classroom in the middle of class when she felt a burst of tics coming on, when she needed to pace, or when she had anxieties. Her second grade teacher reported that, while BRB's comprehension was good on some days, the teacher questioned on bad days whether BRB was

listening or whether she was unable to focus. Tr. 94. This evidence reflects BRB's inability to stay on task and complete projects without distraction. Although the ALJ recognized BRB's high grades, her grades were no doubt a result of the extensive modifications provided to her at school. This is evidenced, for example, by her inability to complete even a full page of questions at school without having to first separate the questions in parts.

Even more problematic were BRB's problems away from school. At home, BRB often paced in her room for periods of 45 minutes or longer and, if interrupted, she started over. Tr. 164, 169, 176. Generally, her mother had to physically intervene to pull BRB away from her pacing. Tr. 164. Her mother testified that BRB often "loses track" and that one could see in her eyes "that she's just not there, and she will walk back and forth, back and forth." Tr. 198. Ms. Bendlin also testified that BRB could not dress herself in the morning because she could not focus. Tr. 209. Her mother testified that BRB played tee ball but that she would never notice the ball coming toward her. Tr. 208.

Additionally, BRB's doctors recognized her serious problems with maintaining her attention. At her December 17, 2008, appointment with Dr. Segreto, Dr. Segreto observed that BRB had difficulty sitting still, that she both lay and sat on the couch and stomped her foot on the floor. Tr. 175. Dr. Segreto further noted that BRB periodically in the evaluation asked her mother things that had nothing to do with the evaluation. Dr. Segreto opined that BRB's thought processes was a little scattered, although it was probably because she was not interested in the evaluation. Tr. 175.

BRB's treatment records at Mayo Clinic further provide notable observations regarding her attention problems. For example, one doctor observed that "[BRB] . . . certainly has Tourette syndrome. She also has associated problems with anxiety and attention. The attention issues are a bit hard to sort out because they certainly could be related to being distracted by her tic symptoms as well as being distracted by her anxiety . . . ." Tr. 166. Another doctor stated,

> [a]lthough it is possible that a portion of this could be the fact she is thinking about things while she is doing these compulsive behaviors [such as pacing back and forth], I am worried given her family history of ADD as well as the association

> of ADD with tics that even after these
> compulsive behaviors are under control
> [BRB] will still have symptoms of
> inattention. . . . I think if we got rid
> of the motor tics [BRB] would still have
> problems with the attention and with
> compulsive behavior.

Tr. 167-68.

The ALJ determined that any concerns about this domain of functioning were "apparently solved" by the Focalin, which Dr. Segreto prescribed for BRB in December 2008. There is evidence that BRB experienced <u>some</u> improvement while on Focalin, as revealed in Ms. Bendlin's testimony and Dr. Segreto's treatment notes; however, there is no specific evidence as to the scope of BRB's improvements at school or whether she improved at home after Dr. Segreto increased her dosage in March 2009. Additionally, Ms. Bendlin testified that BRB's tic problems were not improved even on Focalin.[7] As her Mayo Clinic records reveal, her tic disorder could certainly be a cause for BRB's attention problems. Finally, while BRB's symptoms reportedly improved in March 2009, Dr. Segreto assessed BRB only a GAF score of 50 at that time,

_____

[7] Notably, motor or vocal tics are possible side effects of Focalin. <u>See</u>: Medline Plus Medical Encyclopedia, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603014.html

which reflects "serious" symptoms. Thus, the Court is not persuaded that BRB's symptoms were improved to such a level that would render her less than marked in this domain of functioning. The evidence instead reveals that BRB's pacing, motor tic, and attention problems both in and out of school left her markedly, if not extremely, limited in the "attending and completing tasks" domain of functioning.

In the "interacting and relating with others" domain of functioning, the ALJ concluded that BRB evidenced no more than a "de minimus" limitation. Tr. 18. The ALJ reasoned that BRB's second grade teacher stated she was a well-mannered and quiet girl. The ALJ further reasoned, "as [BRB] has been involved in various organized activities outside the school setting according to her mother . . . it appears she may just be shy." Tr. 18. The record does not support this conclusion.

First, determining that BRB was well-mannered does not, in and of itself, support a conclusion that she interacted and related with others on any meaningful level. Indeed, BRB's mother testified that BRB did not have any friends. This Court finds it remarkable that BRB regularly attended King's

Camp and played tee ball, but did not acquire a single friend among her peers. Moreover, although she may have been well-mannered at school, she was often combative with her mother and brother at home. Tr. 169; 211-12.

Regarding BRB's lack of friendships, her mother testified that BRB did not socialize with other kids in or out of school because she was "too picky." She further testified that BRB needed "to have things her way. She used to have a friend, but the friend doesn't come over anymore because they fight." Tr. 210. In Dr. Segreto's report, she states: "[BRB's mother] says that [BRB] very seldom plays with anybody else. She has to have things a certain way so prefers to read or play alone." Tr. 176. This evidence reveals that shyness is not the reason BRB had no friends; rather, BRB was "too picky," had to have things her way, and fought with her only previous friend. The medical records also did not express any concern that BRB was shy. At one point, a Mayo Clinic doctor noted that BRB answered questions for herself instead of deferring to her mother, which was unusual for a child her age. Tr. 166.

BRB's inability to acquire any friend despite being

placed in social situations and absent any evidence of shyness, is quite troubling. The evidence in the record reveals she is unable to socially or emotionally connect on any positive level with her peers and, at times, her mother and brother. Thus, the Court is persuaded that BRB was markedly limited in this domain of functioning.

In the "caring for yourself" domain of functioning, the ALJ concluded that BRB had no limitation. The ALJ reasoned that while BRB continued to have some problems in dressing herself in a timely manner, she did not experience any problems in caring for herself while in school and in various doctor reports was reported to be well-groomed. Tr. 20. The Court is persuaded the evidence does not support the ALJ's conclusion. At the ALJ hearing, BRB's mother testified as follows:

> Q: Is she able to dress herself?
>
> A: No.
>
> Q: How so?
>
> A: I have to dress her because she can't stay focused.
>
> Q: Explain.
>
> A: One day I was telling her to get her

> pants on, and I said, they're sitting
> on the couch, and it took about ten
> minutes for it to register.  She kept
> going over to the couch wanting to
> know why am I here.

> Q:  Is she watching cartoons or is there
>     something else that was--

> A:  No.

> Q:  -- fun at the time?

> A:  No.  The TV was turned off.

Although the ALJ notes that her medical records show that BRB is well groomed, this is not surprising given that her mother dresses her daily.  A child of her age should be able to dress herself with only occasional reminders.  <u>See</u> 20 C.F.R. § 416.926a(k)(iv).

BRB also suffered urinary incontinence problems and was unaware of it when it happened.  Her mother testified,

> [s]he has had several urinary tract
> infections . . . .  When we went to the
> Mayo Clinic . . . I was talking to them
> about it, too, and we can't decide whether
> or not it's from when she's having one of
> her tics, when she tenses up if she
> urinates a little in her underwear, and
> she's not aware of it, and that's what's
> causing the [urinary tract infections].
> Because she's had several.

Tr. 215.  The evidence of BRB's inability to dress her herself

combined with her urinary incontinence reveals that she was unable to independently care for herself physically and was markedly limited in this domain of functioning.

## III.        CONCLUSION

For the reasons stated herein, the Court is persuaded that substantial evidence in the record does not support the ALJ's finding that BRB is not disabled. Substantial evidence shows BRB is, at a minimum, markedly limited in the second ("attending and completing tasks"), third ("interacting and relating with others"), and fifth ("caring for yourself") domains of functioning. The Court is further persuaded that there is no need to remand to the Commissioner to take additional evidence. The record contains sufficient evidence to allow the Court to render this decision.

**IT IS THEREFORE HEREBY ORDERED**, pursuant to sentence four of 42 U.S.C. § 405(g), that the decision of the ALJ is reversed, and the Commissioner is directed to compute and award disability benefits with an onset date of March 7, 2008.

A timely application for attorney fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 ("EAJA"), must be filed within thirty (30) days of the entry of final judgment in this action. Thus, if this decision is not appealed, and the plaintiff's attorney wishes to apply for EAJA fees, he must do so within 30 days of the entry of the final judgment in this case.

**IT IS SO ORDERED** this 30th day of September, 2010.

Donald E. O'Brien, Senior Judge
United States District Court
Northern District of Iowa